UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARTHA A. NIELSEN,

                                         1:15-cv-623

             Plaintiff,             (GLS/CFH)

             v.

PIONEER BANK et al.,

             Defendant.
_____

**APPEARANCES:**                        **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Dreyer, Boyajian Law Firm           JOHN B. CASEY, ESQ.
75 Columbia Street
Albany, NY 12210

**FOR THE DEFENDANTS:**
Bond, Schoeneck & King, PLLC     MICHAEL D. BILLOK, ESQ.
22 Corporate Woods, Suite 501
Albany, NY 12211

**Gary L. Sharpe**
**Senior District Judge**

## **MEMORANDUM-DECISION AND ORDER**

### I. Introduction

Plaintiff Martha Nielsen commenced this action against defendants

Pioneer Bank, Thomas Amell, and Jesse Tomczak pursuant to Title VII of

the Civil Rights Act of 1964[1] and the Age Discrimination in Employment Act (ADEA),[2] seeking damages for employment discrimination on the basis of her gender and age. (Compl., Dkt. No. 1.) Pending before the court is defendants' motion to dismiss. (Dkt. No. 10.) For the reasons that follow, the motion is granted in part and denied in part.

## II. Background[3]

### A. Facts

Martha Nielsen is a sixty-one year old female who formerly worked at Pioneer Bank. (Compl. ¶ 6.) Over the course of her twenty-eight year career, she managed Pioneer's savings bank life insurance program, served as the president of PSB Financial Services, Inc. (PSBFS), which is Pioneer's wholly-owned subsidiary company, and worked as Pioneer's insurance officer. (*Id.* ¶¶ 6, 8, 13, 16-17, 19.) Nielsen led a team of two financial advisors and approximately thirty sales representatives. (*Id.* ¶ 20.) As required by her position, Nielsen earned Financial Industry Regulatory Authority (FINRA) Series 7, 24, 63, and 65 licenses as well as

---

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

[2] *See* 29 U.S.C. §§ 621-634.

[3] The facts are drawn from Nielsen's complaint and presented in the light most favorable to her.

licenses in state life insurance, state accident and health insurance, and state property and casualty insurance.  (*Id.* ¶¶ 21-22.)  Nielsen was also a certified financial planner.  (*Id.* ¶ 22.)

In 2012, Pioneer's Board of Trustees hired Amell to replace its outgoing president and chief executive officer, and he assumed full responsibilities a year later.  (*Id.* ¶¶ 25-27.)  Amell began implementing firm wide practices that would appeal to "younger, urban customers," including "adopting a work culture based upon the John Lennon song 'Imagine' [that] would create a 'world-class' work environment."  (*Id.* ¶¶ 28-30.)  To further this goal, Amell hired Tomczak in November 2013 for the newly created position of chief customer experience officer.  (*Id.* ¶ 33.)  Tomczak was not registered with FINRA and had not passed any principal or supervisory examinations.  (*Id.* ¶ 34.)  As the chief customer experience officer, Tomczak supervised Nielsen.  (*Id.* ¶ 35.)

In the fall of 2013, Pioneer's executive vice president and chief administrative officer, Frank Sarratori, expressed to Nielsen that "[s]ome people fe[lt] that [she] w[ould] have a problem fitting into the new culture, but [he] told them that [she] would fit in because [she] dress[ed] young and stylish."  (*Id.* ¶ 32.)  In January 2014, Nielsen received her annual

3

performance review from Tomczak and a pay raise.  (*Id.* ¶ 38.)  In her performance review, Tomczak explained that one of Pioneer's objectives for the upcoming year was to assess whether financial advisors and in-branch licensed individuals could transform the investment division to be "world class."  (*Id.* ¶ 39.)

Under Nielsen's management, PSBFS's revenues increased by more than eleven percent in the first quarter of 2014 over the previous year for the same period.  (*Id.* ¶ 45.)  Nielsen also met or exceeded all goals set for PSBFS in that quarter.  (*Id.* ¶ 40.)

On April 9, 2014, Tomczak asked to meet with Nielsen.  (*Id.* ¶ 41.)  At the meeting, he informed her that she was doing a "terrible job" and would be demoted to the position of a financial advisor.  (*Id.* ¶ 42.)  Tomczak explained that he was now going to run PSBFS himself.  (*Id.* ¶ 43.)  He asked her to think about their conversation over the weekend.  (*Id.* ¶ 44.)

The next week, while Amell was on vacation, one of the financial advisors that Nielsen supervised informed her that he had improperly processed a $160,000 transfer to a third party account.  (*Id.* ¶¶ 46, 49.)  The financial advisor explained that he followed instructions emailed to him, but later found out that the email account had been hacked and the

4

instructions were drafted by the hacker.  (*Id.* ¶ 46.)  Nielsen reported the improper transfer to Sarratori, Pioneer's outside compliance department, and the financial advisor's regulatory supervisor.  (*Id.* ¶ 47.)  Pioneer terminated the financial advisor that same week, and Nielsen and her staff managed inquires from his clients and informed them about his departure and the status of their bank accounts.  (*Id.* ¶¶ 48, 50.)

Once Amell returned from vacation, he arranged a meeting with Nielsen and Tomczak on April 22.  (*Id.* ¶¶ 51-54.)  Although she was not notified about the purpose of the meeting, Nielsen assumed that it was to discuss the financial advisor's termination.  (*Id.* ¶ 54.)  Amell, however, dismissed such discussion and turned to Nielsen's retirement plans.  (*Id.* ¶ 56.)  He asked her how long she intended to stay with Pioneer, and she responded that she expected to remain for another five to six years.  (*Id.* ¶¶ 56-57.)  Amell presented Nielsen with a choice.  (*Id.* ¶¶ 58-61.)  He explained that if she wanted to make a "soft landing" into retirement, Nielsen would have to accept a demotion to the newly vacant financial advisor's position and assume his clients.  (*Id.* ¶ 58.)  In this position, Nielsen's salary and commissions would be reduced.  (*Id.*)  Additionally, Nielsen would be required to train Tomczak to run PSBFS.  (*Id.* ¶ 59.)

Alternatively, Amell stated that Nielsen would have to quadruple PSBFS's sales within six months or face "dire consequences." (*Id.* ¶ 60.) Amell informed Nielsen that she had one day to make a decision. (*Id.* ¶ 61.) As Nielsen left, Amell called her staff "losers" and expressed that no quality broker would want to work at Pioneer as long as "those kind of people" worked there. (*Id.* ¶ 62.)

The following day, Nielsen notified Amell that she refused either option and instead chose to take early retirement rather than face further discriminatory treatment. (*Id.* ¶ 64.) Nielsen then timely filed charges of age and gender discrimination jointly with the New York State Department of Human Rights (DHR) and the United States Equal Employment Opportunity Commission (EEOC). (*Id.* ¶ 5; Dkt. No. 1, Attach. 1; Dkt. No. 16, Attach. 2.) The DHR and EEOC later dismissed the complaint finding that the evidence did not support the charges of unlawful discrimination and issued a right to sue letter. (Dkt. No. 1, Attach. 1; Dkt. No. 10, Attach. 4.) Thereafter, on May 21, 2015, Nielsen commenced this action against Pioneer Bank, Amell, and Tomczak. (*See generally* Compl.)

### III. Standard of Review

The standard of review under Fed. R. Civ. P. 12(b)(6) is well

established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior opinion in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010), *abrogated on other grounds by Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191 (2d Cir. 2015).

## IV. Discussion

### A. Individual Liability

In addition to Pioneer Bank, Nielsen named Amell and Tomczak as defendants. (*See generally* Compl.) Defendants argue that Amell and Tomczak must be dismissed because Title VII and the ADEA do not provide for individual liability for claims of employment discrimination. (Dkt. No. 10, Attach. 1 at 7-8.) Nielsen agrees that Amell and Tomczak should be dismissed in their individual capacities but asserts they remain liable in their professional capacities. (Dkt. No. 16 at 10-11.)

Neither Title VII nor the ADEA "create liability in individual supervisors and co-workers who are not the plaintiff['s] actual employers." *Raspardo v. Carlone*, 770 F.3d 97, 113 (2d Cir. 2014) (Title VII); *see Cherry v. Toussaint*, 50 F. App'x 476, 477 (2d Cir. 2002) (ADEA). Nielsen relies on readily distinguishable authority to support her position. (Dkt.

7

No. 16 at 10-11.) In *Wierzbicki v. County of Rensselaer*, No. 1:14-cv-950, 2015 WL 4757755, at *6 (N.D.N.Y. Aug. 12, 2015), the court dismissed Title VII and ADEA claims against a county director of probation on the ground that she was not liable in her individual capacity, but the court allowed the claims asserted against her in her official capacity. Here, however, Amell and Tomczak are individuals employed by a private employer and not government employees amenable to suit in their official capacity. *See, e.g.*, *Smith v. Am. Int'l Grp., Inc.*, No. 01 Civ. 1652, 2002 WL 745603, at *5 (S.D.N.Y. Apr. 26, 2002) (holding "a Title VII suit cannot be maintained against an individual employed by a private employer in his 'official capacity'"). Accordingly, all claims against Amell and Tomczak must be dismissed.

**B.     Gender and Age Discrimination**

Nielsen alleges ADEA and Title VII claims for age-based disparate treatment and gender-based disparate treatment, respectively. (*See generally* Compl.) Both claims are subject to the familiar burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Delaney v. Bank of Am.* Corp., 766 F.3d 163, 167-68 (2d Cir. 2014) (ADEA).

8

The plaintiff bears the initial burden to establish a prima facie case of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802. To satisfy this burden, the plaintiff must allege that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination. *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012). Then, the employer must articulate a legitimate, nondiscriminatory reason for its adverse employment action. *See id.* Once stated, "the *McDonnell Douglas* presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000). To that end, the plaintiff must demonstrate that the employer's proffered reason is pretext for unlawful discrimination. *See Reynolds*, 685 F.3d at 202. Regarding Nielsen's ADEA claim, she must sufficiently allege that age was the but for cause of the adverse employment action. *See Delaney*, 766 F.3d at 168 (noting the Supreme Court eliminated a mixed-motive analysis for ADEA claims).

At the motion to dismiss stage, a plaintiff "need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination, [but only] give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). Thus, courts must evaluate "whether the well-pleaded factual allegations *plausibly* give rise to an inference of unlawful discrimination, *i.e.*, whether plaintiffs allege enough to 'nudge[] their claims across the line from conceivable to plausible.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).

Defendants do not contest, and the court agrees, that Nielsen satisfies the first two prongs of her prima facie showing for both claims, namely, that she is female over the age of forty and qualified for her former position. They instead argue that Nielsen fails to sufficiently allege that opting for early retirement amounted to an adverse employment action or that such action gave rise to an inference of gender or age discrimination. (Dkt. No. 10, Attach. 1 at 8-20.) Nielsen counters that she was constructively discharged and, among other things, would be required to train a younger, male colleague to replace her. (Dkt. No. 16 at 11-14.)

10

1. *Constructive Discharge*

Constructive discharge is a cognizable adverse employment action. *See Terry v. Ashcroft*, 336 F.3d 128, 152-53 (2d Cir. 2003). An employee is constructively discharged when an employer "intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Id.* at 151-52. Although the plaintiff need not show that her employer specifically intended for her to resign, she must allege that her "employer's actions were deliberate and not merely negligent or ineffective." *Petrosino v. Bell Atl.*, 385 F.3d 210, 230 (2d Cir. 2004) (internal quotation marks and citation omitted). Equally important, the plaintiff must allege that her work conditions were sufficiently intolerable to compel resignation. *See id.* Courts objectively assess such conditions from a reasonable person's perspective in the employee's position. *See id.* Finally, actual as well as impending demotions may support a claim of constructive discharge. *See, e.g.*, *Scott v. Harris Interactive, Inc.*, 512 F. App'x 25, 28 (2d Cir. 2013) ("[O]ur precedent recognizes that loss of pay or change in title may amount to constructive discharge." (internal quotation marks and citation omitted)); *Wilkins v. Time Warner Cable, Inc.*, 10 F. Supp. 3d 299, 308-09 (N.D.N.Y. 2014) (holding that resignation before

11

anticipated changes to an employee's pay or title was constructive discharge); *Alferi v. SYSCO Food Servs.*, 192 F. Supp. 2d 14, 24 (W.D.N.Y. 2001) (noting that threats of immediate discharge, demotion, or cut in pay may amount to constructive discharge).

Here, Nielsen sufficiently alleges that she was constructively discharged. First, at the April 9, 2014 meeting, Tomczak informed Nielsen that she would be demoted to a financial advisor, and he would be taking over PSBFS, the subsidiary which Nielsen headed since its founding in 1997. (Compl. ¶¶ 16-17, 42-43.) Then, at the April 22, 2014 meeting, Amell presented her with a choice between a demotion and pay cut to the position of financial advisor or to remain the president of PSBFS on the condition that she increase sales fourfold within six months or face "dire consequences." (*Id.* ¶¶ 58-60.) Reading the complaint in the light most favorable to Nielsen, *see Ellis*, 701 F. Supp. 2d at 218, "dire consequences" can be plausibly inferred to mean her termination or demotion. Notably, Nielsen alleges that PSBFS's first quarter revenues increased by only eleven percent over the previous year, (Compl. ¶ 45), raising the reasonable inference that Amell's directive that Nielsen quadruple sales within six months was unrealistic at best. As such, the

second option can reasonably be interpreted as tantamount to a threat of a demotion or termination. Contrary to the authority on which defendants rely, her demotion or termination was apparently inevitable and not merely speculative. (Dkt. No. 10, Attach. 1 at 18 (citing *Rother v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 95 (N.D.N.Y. 2013).) Although Nielsen opted to retire rather than select either choice presented by Amell, her allegations at this stage of the litigation support her claim of constructive discharge. *See Wilkins*, 10 F. Supp. 3d at 309 (finding plaintiff established constructive discharge "although he resigned before the anticipated changes to his position took place").

> 2. *Inference of Discrimination*

It is well settled that a plaintiff's burden to state a prima facie case of employment discrimination is minimal. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005). Here, defendants seek to parse Nielsen's allegations and argue that each standing alone is insufficient to raise an inference of discrimination based on gender or age. (Dkt. No. 10, Attach. 1 at 8-14.) Specifically, defendants contend that the comments directed at Nielsen are merely stray remarks and that she has failed to identify a similarly situated younger male employee who has received preferential

13

treatment. (*Id.*) When evaluating a motion to dismiss, however, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 731 (2d Cir. 2013) (internal quotation marks and citation omitted).

Here, Nielsen has alleged: (1) comments linking her age to her ability to perform her job; (2) inquiries from her supervisors about the proximity of her retirement and an explanation about a necessary demotion if she wanted retire with a "soft landing"; and (3) threats that Tomczak, a younger, male employee would inevitably replace her as president of PSBFS. (Compl. ¶¶ 32, 34-35, 43, 56-58.) The Second Circuit has stated that "there is no unbending or rigid rule about what circumstances allow an inference of discrimination," and "the fourth element set forth in *McDonnell Douglas* is a flexible one that can be satisfied differently in differing factual scenarios." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). As noted above, the allegations support a reasonable inference that Nielsen would inevitably be subject to demotion or termination and that Tomczak would replace her as president of PSBFS. Because Nielsen

14

would inevitably be demoted and replaced by someone outside of her protected class, here, a younger, male, she sufficiently alleges an inference of age and gender discrimination. *See Wierzbicki*, 2015 WL 4757755, at *5 (noting that filling a position with "someone outside of the plaintiff's protected class is itself enough to give rise to such a [discriminatory] inference"); *see also Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Defendants appear to argue that they presented Nielsen with a choice between a demotion or a significant increase in workload because "PSBFS was facing an unforeseen, dire situation" as a result of the financial advisor's termination. (Dkt. No. 10, Attach. 1 at 14.) However, an employer's "competing explanations [for an adverse employment decision] are better evaluated at the summary judgment stage or beyond, and not on a motion for judgment on the pleadings." *Vega*, 801 F.3d at 89. Accordingly, Nielsen sustained her burden of alleging facts sufficient to suggest an inference of discrimination, and defendants' motion is denied on this ground.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 10) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to Nielsen's claims against Amell and Tomczak; and

**DENIED** with respect to all other claims; and it is further

**ORDERED** that the Clerk terminate Thomas Amell and Jesse Tomczak from this action; and it is further

**ORDERED** that the parties notify Magistrate Judge Christian F. Hummel in order to schedule further proceedings in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 13, 2016
Albany, New York

*/s/ Gary L. Sharpe*
Gary L. Sharpe
U.S. District Judge